**UNITED STATES of America, Plaintiff,**

v.

**BRANCH RIVER WOOL COMBING COMPANY, Inc., The French Worsted Company, Defendants.**

**Civ. A. No. 3123.**

United States District Court, D. Rhode Island.

Jan. 11, 1971.

Raymond W. Phillips, Dept. of Justice, Washington, D. C., Lincoln C. Almond, U. S. Atty., Providence, R. I., for plaintiff.

Owen P. Reid, Providence, R. I., Jacob Imberman, New York City, for Branch River.

Allan M. Shine, Winograd, Winograd & Marcus, Providence, R. I., for The French Worsted Co.

Michael A. Silverstein, Providence, R. I., for Creditors Committee (French Worsted).

OPINION

DAY, Chief Judge.

In this action which was instituted in this Court on May 13, 1963, the plaintiff sought to set aside the acquisition by

---

the defendant Branch River Wool Combing Company, Inc. (hereinafter referred to as "Branch River") of the combing division machinery of the defendant, The French Worsted Company (hereinafter referred to as "French Worsted"). In its complaint the plaintiff alleged that the effect of such acquisition may be to substantially lessen competition or to create a monopoly in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. On April 13, 1964, a consent judgment was entered by this Court in compliance with which Branch River sold said machinery back to French Worsted.

Said consent judgment in Section V(c) thereof enjoined and restrained Branch River, during the period beginning April 13, 1969 and ending April 12, 1974—

> "* * * from acquiring directly or indirectly from any person engaged in the production of wool top in the United States any machinery used in the production of wool top, other assets, business, good will, stock of, or other financial interest in any person engaged in the production or sale in the United States of wool top except upon approval of this Court after notice to the plaintiff and upon establishing to the satisfaction of this Court that such acquisition will not substantially lessen competition or tend to create a monopoly in the production or sale of wool top.

> Provided, however, that this Section V shall not be deemed to prohibit defendant Branch River from acquiring from any source any machinery or parts thereof used in the production of wool top needed by it as a replacement for machinery or parts in any of its plants."

This matter is now before me upon the application of Framatex Corporation (hereinafter referred to as "Framatex"), formerly known as Branch River Combing Company, Inc., under the provisions of said Section V(c) for leave to acquire certain wool combing machinery from Marriner & Co., Inc. (hereinafter referred to as "Marriner"), a manufacturer and seller of wool top, whose plant is located in Lawrence, Massachusetts.

From the evidence presented during the hearings on said application it appears that in the spring of 1970, counsel for Framatex and for Marriner initiated discussions with attorneys for the Department of Justice designed to persuade the Department of Justice to consent to the acquisition of said machinery by Framatex. During these discussions said attorneys for the Department of Justice were advised of the serious decline in the wool industry and its adverse effect on Framatex and Marriner. The latter indicated that as a result of heavy losses already sustained by it which were continuing, it intended to discontinue its wool combing operations, and, further, that it could stay in business as a seller of wool top only if it could sell some of its combing equipment to Framatex, and have its wool combed by the latter at certain specified rates per pound which were mutually satisfactory. From the sale of said combing equipment Marriner would secure funds which would enable it to continue in business as a top-maker, and for other necessary corporate purposes.

During these discussions, which occurred at intervals, the President of Marriner, at the request of attorneys for the Department of Justice, contacted every company in the United States which could have utilized Marriner's combing equipment and offered to sell it for the same price and upon the same terms and conditions that had been agreed upon by Marriner and Framatex. None of the companies so contacted was interested in purchasing said equipment from Marriner upon said terms and conditions. The discussions between counsel for Framatex and Marriner and the attorneys for the Department of Justice ended in September, 1970, with the Government consenting to the proposed transaction between Framatex and Marriner by a stipulation filed with this Court on September 30, 1970. Said stipulation provided that an order in the form at-

tached thereto could be entered by the Court at any time after the expiration of thirty (30) days following the date of its filing without further notice to any party or other proceeding, provided the plaintiff had not withdrawn its consent as provided therein. Said stipulation also provided that the plaintiff might withdraw its consent at any time within thirty (30) days by serving notice thereof upon Framatex and filing such notice with this Court.

Apparently relying upon this consent and in order to reduce its increasing losses Marriner closed its combing plant on October 2, 1970 and began to dismantle its combing machinery.

Thereafter, on October 26, 1970, French Worsted filed a motion for an extension of time in which it could file objections to said proposed order permitting the acquisition of said machinery by Framatex. After a hearing on October 28, 1970, I entered an order granting the request of French Worsted for an additional thirty (30) days in which to file its objections to the entry of that order, and extended for the same period the time within which the plaintiff might withdraw its consent to its entry.

On November 30, 1970, the plaintiff filed a withdrawal of said consent, said withdrawal apparently having been executed on November 24, 1970. On the same day, November 30, 1970, French Worsted filed its objection to the entry of the proposed order, supported by the affidavit of its President.

Thereafter hearings were held by me on said application of Framatex and the objections thereto filed by French Worsted. Evidence was presented by each of them in support of their respective contentions. No evidence was presented by the plaintiff, although it was represented by counsel who participated in said hearings. At the conclusion thereof he stated that the plaintiff had no objection to the proposed transaction between Marriner and Framatex.

The evidence presented during said hearings clearly establishes that the wool industry has been for a number of years in a period of general decline. It further shows that despite the increase in population in the United States, the amount of wool purchased and processed in this country has steadily decreased due to an enormous increase in the use of artificial fibers in the manufacture of apparel fabrics and a substantial increase in imports of wool products into the United States. The evidence also shows that the amount of wool combed in the United States has declined from 157 million pounds in 1966 to an estimated 110–115 million pounds in 1970. Framatex is, and for more than forty-five (45) years has been, a commission comber of wool and has performed this service primarily for small and medium sized top-makers. The decline in the wool business in the United States has also adversely affected Framatex which operates a combing plant in Woonsocket, Rhode Island, in which 300 persons are employed. According to the evidence, although it has the capacity to comb about 18 million pounds of wool a year and is the possessor of the highest technical skills, Framatex has on the average combed less than 12 million pounds of wool each year during the last four years. In the fiscal year ended June 30, 1970, it combed approximately 10.5 million pounds of wool and suffered an operating loss of approximately $200,000. The evidence also establishes that a substantial portion of its combing equipment is becoming obsolete and should be replaced by more modern equipment.

In addition, the evidence establishes that further decline in its business seems likely. Although it has been the custom for the customers of Framatex to give it their commitments for combing wool in June of each year for the ensuing twelve (12)-month period beginning July 1, Framatex has received commitments for the combing of less than 6 million pounds of wool for the period from July 1, 1970 to June 30, 1971. Unless Framatex can secure additional combing business it is certain to suffer additional and increasing operating loss-

es which cannot be sustained indefinitely.

Similarly, the evidence establishes that Marriner, since 1951, has been engaged in the manufacture and sale of wool top and has operated its own combing facilities. Although it has invested large sums during the last three years to modernize its combing equipment, Marriner has suffered large operating losses attributed to its combined operations. Between 1968 and 1970 Marriner's annual production of wool top declined from approximately 18 million pounds to 14 million pounds, and in the thirty (30)-month period ending February 28, 1970, Marriner lost in excess of $1,-000,000.

As hereinbefore recited, Marriner discontinued its combing operations in October, 1970, has dismantled its combing machinery which is lying idle in its plant with the incidental cost of its maintenance. Although Marriner desires to stay in business as a seller of wool top, it cannot do so unless it can have approximately 8 million pounds of wool combed by a commission comber with the available capacity and the ability to produce a fine quality of top in sufficient quantities. From the evidence presented it is clear that Framatex is the only commission comber which can meet these requirements, provided it can acquire the combing machinery which Marriner desires to sell. If Marriner cannot sell said combing machinery to Framatex, the conclusion is inescapable that it will be forced to sell it at public auction to its detriment. At best it is problematical whether it could thereafter continue in the top-making business.

From the exhibits introduced during said hearings, it is clear that almost three-quarters of the purchase price which Framatex proposes to pay for the acquisition of said combing machinery and parts represents the cost of machinery and parts needed to replace obsolete machinery and parts in its plants. Insofar as the acquisition of such replacements is concerned, Framatex is not required to seek the prior approval of this Court under the provisions of said Section V(c) quoted above, of said judgment entered on April 13, 1964.

■ French Worsted objects to the application on the ground that the acquisition by Framatex of said combing machinery and parts will make it virtually impossible for it to re-open its combing division. No probative evidence was presented by it to support this contention. Since July 16, 1970, it has been operating under an arrangement with its creditors under the provisions of Chapter 11 of the Bankruptcy Act. No attempts since then have been made by it to re-open its combing division, and there was no probative evidence that its reopening is at all likely. In addition, in view of the present financial predicament of French Worsted, it is clear that Marriner would not be a potential customer of French Worsted for its future combing requirements. Similarly, there has been no probative evidence presented by French Worsted or its creditors' committee that the combing tariffs which Framatex proposes to charge Marriner for its combing will adversely affect the so-called "independent top-makers". Even if it be assumed that certain of them may be affected adversely thereby, such possible injury would not justify the denial of approval of said proposed transaction sought by Framatex. It is well settled that the antitrust laws are not intended to protect a business against loss in a competitive market. Armour and Company v. United States, 402 F.2d 712, 719 (7th Cir. 1968); Ben Hur Coal Co. v. Wells, 242 F.2d 481, 486 (10th Cir. 1957), cert. denied 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1427 (1957).

■ After a careful consideration of all of the evidence and the reasonable inferences to be drawn from it, I am of the opinion that the effect of the proposed transaction between Framatex and Marriner will not be substantially to lessen competition or tend to create a monopoly in the wool top industry. On the contrary, I am satisfied that it will

permit each of those corporations to improve its respective financial condition and increase rather than lessen competition in said industry. Clearly there was no credible evidence that it would tend to create a monopoly therein.

Accordingly the application of Framatex must be and it is granted. Counsel for Framatex will prepare and present for entry an appropriate order. Such order shall include the relevant provisions contained in said stipulation between counsel for the plaintiff and for the defendant, filed with this Court on September 30, 1970.